UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**In re:**                                               **Case No.: 3:12-bk-7617-JAF**

**TIMOTHY JOSEPH WIERZBICKI,**

     **Debtor.**

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case came before the Court upon Acting United States Trustee's (the "Trustee")

Motion to Dismiss Pursuant to 11 U.S.C. [§§] 707(b)(1) and 707(b)(3) and Request for

Clerk to Hold Discharge Pending Hearing (Doc. 43)(the "Motion to Dismiss"). The Court

conducted an evidentiary hearing at which the parties entered into a detailed factual

stipulation, which was admitted as the Trustee's Exhibit 5. The Trustee also introduced other

exhibits at the hearing. Additionally, Debtor testified at the hearing. In lieu of oral argument,

the Court directed the parties to submit memoranda in support of their respective positions.

Upon the evidence and the applicable law, the Court makes the following Findings of Fact and

Conclusions of Law.

### Findings of Fact

On November 27, 2012, Debtor filed a voluntary chapter 7 bankruptcy petition, along

with Schedules and a Statement of Financial Affairs to initiate the instant case. (Tr.'s Ex. 2). On

May 3, 2013, the Trustee filed the Motion to Dismiss, which seeks dismissal of the instant case

for bad faith and totality of the circumstances pursuant to 11 U.S.C. §§ 707(b)(3)(A) and (B).

Debtor's debts are primarily consumer debts. (Tr.'s Ex. 5, ¶ 4). Debtor is 48 years old

and is a practicing neurologist. (Tr.'s Ex. 5, ¶¶ 7, 8). Debtor was previously married. (Tr.'s Ex.

5, ¶ 7). His first marriage produced two children, who are 15 and 17. (Id.) Debtor and his former wife divorced in 2005. (Tr.'s Ex. 5, ¶ 5).

Debtor is required to pay his former wife $10,000.00 per month as permanent periodic alimony. (Tr.'s Ex. 5, ¶ 30). In 2012 Debtor made alimony payments in the amount of $120,000.00. (Id.) Debtor has not made an alimony payment since January of 2013. (Id.)

Debtor is required to pay $2,800.00 per month in child support. (Tr.'s Ex. 5, ¶ 29). Debtor has not made any child support payments since January of 2013. (Id.) Debtor received a Notice of Deficiency from the clerk of Circuit Court stating that as of May 31, 2013 he was $14,000.00 in arrears in child support payments. (Tr.'s Ex. 5, ¶ 31). Debtor's child support payments will be reduced when Debtor's oldest child turns 18 in June, 2014. (Tr.'s Ex. 5, ¶ 29).

Debtor remarried in 2006. (Tr.'s Ex. 5, ¶ 5). Debtor and his wife have a 4 year old son who was born in 2009. (Tr.'s Ex. 5, ¶¶ 6, 25). Debtor's 4 year old son was diagnosed prenatally with multiple congenital heart defects which required specialized medical services including delivery and heart surgery following delivery. (Tr.'s Ex. 5, ¶ 25). Debtor and his wife travelled to Boston, Massachusetts in 2009 to prepare for the delivery of their son at a specialty hospital. (Id.) A team of surgeons was prepared to do heart surgery on him the moment he was born. (Id.) Debtor's son's condition was life threatening and extremely medically complex. (Id.) Debtor did not receive a salary from January 1, 2009 to June, 2009 while he was in Boston with his wife and son. (Tr.'s Ex. 5, ¶ 26).

Debtor's son was admitted to the specialty hospital in Boston for three weeks in January of 2011 to complete surgical repairs to his heart. (Tr.'s Ex. 5, ¶ 27). Debtor's son has not been admitted to a hospital or had surgery since 2011, but has required emergency care for possible infections. (Tr.'s Ex. 5, ¶ 28). Debtor's son's cardiac conditions will affect him for the rest of

2

his life and will result in continuing medical expenses, not all of which are covered by insurance. (Tr.'s Ex. 5, ¶ 27). Debtor's son is currently enrolled in regular preschool. (Tr.'s Ex. 5, ¶ 28).

As of the petition date, Debtor was a neurologist at Neurology Associates of Ormond Beach ("Neurology Associates"), where he had been a partner for 13 years. (Tr.'s Ex. 5, ¶ 12). Neurology Associates is a neurology practice comprised of six shareholder neurologists and two non-shareholder neurologists. (Id.) Debtor earned $537,052.00 from Neurology Associates in 2012 and $595,422.00 in 2011. (Tr.'s Ex. 5, ¶¶ 13, 15). Approximately 50% of Debtor's income from Neurology Associates was from ancillary services such as MRI services, physical therapy and brain wave and sleep institute income. (Tr.'s Ex. 5, ¶ 16).

Debtor voluntarily left his employment at Neurology Associates on March 7, 2013, to form his own practice, the Brain and Spine Institute of Port Orange (the "Brain Institute") (Tr.'s Ex. 5, ¶ 19) where he operates as a sole practitioner. (Tr. at 36). The Factual Stipulation does not set forth a specific reason as to why Debtor left his position at Neurology Associates but provides that "Debtor left Neurology Associates due to philosophical and ethical differences with his partners. The Debtor felt that he could no longer in good faith continue [practicing] at Neurology Associates." (Tr.'s Ex. 5, ¶ 19). Debtor testified that he began contemplating leaving his employment at Neurology Associates within weeks before he left. (Tr. at 21). In Debtor's opening statement, counsel for the Debtor stated that Debtor became aware of conduct at Neurology Associates that was "unethical and possibly immoral [and] illegal." (Tr. at 9-10). Debtor did not testify at the evidentiary hearing as to the circumstances surrounding his leaving Neurology Associates.

Prior to leaving Neurology Associates, Debtor did not look for other employment opportunities beyond opening a new practice in Volusia County. (Tr.'s Ex. 5, ¶ 20). Debtor

3

testified that hospitals in the area where he lives do not employ neurologists. (Tr. at 21). Debtor testified that he believes physicians who are employed by hospitals earn $150,000.00-$200,000.00 annually. (Tr. at 37).

Neurology Associates is the only neurology group in Debtor's geographical vicinity. (Tr. at 47-48). Debtor testified that he did not consider looking for a job with another neurologist group outside of that area. (Tr. at 22). Debtor further testified that it is uncommon in his geographic area for sole practitioner neurologists to partner with other sole practitioners. (Tr. at 37). Additionally, Debtor testified that he would not have felt comfortable joining any of the sole practitioners in his area because two of them practice pain management, which is not his style and not the area of neurology in which he was trained, and the third has a poor reputation because of his interactions with patients. (Tr. at 37, 39-40).

In response to a question asked by the Court, Debtor testified that he was not interested in looking for a position beyond the Daytona Beach/Ormond area because his children live in that area. (Tr. at 42). Debtor also testified that it would not make sense to relocate beyond that area because he had a patient base from Neurology Associates that could rejoin him in a location which was proximal to where they live and where they previously saw him. (Tr. at 46).

On April 10, 2013, Debtor obtained a loan from family members in the amount of $30,000.00 to assist with startup expenses for the Brain Institute. (Tr.'s Ex. 5, ¶ 21; Tr. at 31). The funds have not been repaid. Debtor is required to repay the $30,000.00 when he has funds available. (Tr.'s Ex. 5, ¶ 21).

Debtor began seeing patients at the Brain Institute on May 6, 2013. (Tr. at 29). Most of Debtor's patients from Neurology Associates are now seeing him at the Brain Institute. (Tr.'s Ex. 5, ¶ 24). Debtor testified that within one to two years, he expects to be earning approximately

4

$200,000 per year, which is the average annual salary for a neurologist in the Southeast Region of the United States. (Tr. at 36-37, 39; Tr.'s Ex. 5, ¶ 23). Debtor does not believe his salary will ever be as high as his prior salary with Neurology Associates because he does not have the ancillary sources of income (Tr.'s Ex. 5, ¶ 23) and does not anticipate earning more than $200,000. (Tr. at 41). Additionally, Debtor testified that as a result of the Affordable Care Act, which became effective in January of 2013, any procedure that he performs which is billed to Medicare or Medicaid will be subject to a 25% reduction. (Tr. at 47).

Debtor's wife is a critical care registered nurse who has not been employed since the birth of their son based upon his medical issues. (Tr.'s Ex. 5, ¶ 9). She is currently working at the Brain Institute, but has not received a salary since the business began. (Tr.'s Ex. 5, ¶ 10). Debtor's wife has a 17 year old daughter for whom she does not receive child support. (Tr.'s Ex. 5, ¶ 11).

As of the date of the hearing, Debtor did not have health insurance and was informed that in order to reinstate the health insurance he previously held with Neurology Associates, he was required to make a payment of $8,044.00. (Tr.'s Ex. 5, ¶ 33). Debtor's monthly premium after the lump sum payment is made will be $2,008.44. (Id.) Debtor's out of pocket medical expenses are normally $1,363.00 per month. (Tr.'s Ex. 5, ¶ 34).

Debtor currently resides at 810 Pheasant Run Ct. W., Port Orange, Florida (the "Pheasant Run Property"), which the Debtor's Schedule A values at $666,956.00 and which is encumbered by a mortgage of $1,476,934.43. (Tr.'s Ex. 5, ¶ 41). Debtor's contractually due monthly payment on the Pheasant Run Property is $9,500.00. (Id.) Debtor is not presently making payments on the Pheasant Run Property and has not made a mortgage payment on the property since December of 2012. ( Id.) Debtor stopped making mortgage payments because he could no

5

longer afford the payment. (Tr. at 23). At the time of the filing, Debtor intended to keep the Pheasant Run Property, but now intends to surrender it. (Tr.'s Ex. 5, ¶ 41). Debtor resides with his wife, his 4 year old son and his 17 year-old stepdaughter (Tr.'s Ex. 5, ¶ 41) and claims a family size of 4 for purposes of the Means Test (Tr.'s Ex. 2 at p. 44).

At the evidentiary hearing, Debtor testified that he expects to pay between $5,000.00 and $7,000.00 per month to rent a house following the surrender of the Pheasant Run Property. (Tr. at 38). As reflected in Debtor's Means Test, the IRS Standard rental expense for a family of four in Debtor's area is $1,334.00 per month. (Tr.'s Ex. 2 at p. 45).

In 2005 Debtor purchased property located on Atlantic Avenue in New Smyrna Beach (the "Atlantic Avenue Property"), which was used as a weekend home. (Tr.'s Ex. 5, ¶ 38). Debtor made payments on the mortgages related to the Atlantic Avenue Property until 2009, the time when medical issues with his newborn son arose. (Tr.'s Ex. 5, ¶ 40). Debtor attempted to modify the mortgage payments, but the secured creditor, Wells Fagro, initiated a foreclosure action and obtained deficiency judgments against him totaling $950,146.14 in 2009. (Tr.'s Ex. 5, ¶ 40; Tr. at 17). In July of 2012, Wells Fargo garnished Debtor's bank account in an attempt to collect on the deficiency judgments. (Tr.'s Ex. 5, ¶ 40). Debtor's Final Judgment of Dissolution of Marriage requires that he hold his former wife harmless relating to the debt on the Atlantic Avenue Property. (Tr.'s Ex. 5, ¶ 39). Wells Fargo also attempted to foreclose on the Pheasant Run Property, but Debtor was able to save it. (Tr. at 18).

According to Debtor's Schedule F and his testimony, Debtor's only unsecured debt is the deficiency related to the Weekend Home. Debtor's unpaid tax liability for 2011 is $64,282.06 pursuant to the proof of claim filed by the Internal Revenue Service on February 13, 2013.

Debtor's post-petition 2012 tax liability is $69,971.00. (Tr.'s Ex. 5, ¶ 14).

In addition to the mortgage debt secured by the *Pheasant Run Property*, Debtor's Schedule D lists a $27,765.84 debt secured by a 2008 GMC Denali. (Tr.'s Ex. 5, ¶ 35). Debtor entered into a reaffirmation agreement relating to the Denali which provides for monthly payments of $480.38. (Tr.'s Ex. 5, ¶ 43).

If Schedule I and J were amended to indicate an anticipated annual salary of $200,000.00 per year and taxes at the rate of 33%, Debtor's monthly net income would be $11,166.00. (Tr.'s Ex. 5, ¶ 46). If Debtor's child support and alimony obligations remain the same, Debtor will have a negative disposable income. (Id.) Debtor has not made an effort to modify his child support or alimony payments despite his drop in income because he cannot afford to hire an attorney to represent him in the matter. (Tr. at 38). However, Debtor intends to seek to modify the obligations. (Tr. at 32).

Debtor is not eligible for Chapter 13 but is eligible for Chapter 11. (Tr.'s Ex. 5, ¶ 44). Debtor testified that he has not considered filing Chapter 11. (Tr. at 34).

Debtor's post-petition bank statements were admitted at the evidentiary hearing as UST's Exhibit 6. The bank statement dated January 15, 2013, reflects total expenditures of $535.92 at ABC Fine Wine, total expenditures of $249.89 at the iTunes Store, and total expenditures of $489.53 at aquarium stores. (Tr.'s Ex. 6). The bank statement dated February 18, 2013, reflects total expenditures of $477.10 at ABC Fine Wine, total expenditures of $214.93 at the iTunes store, and total expenditures of $875.11 at an aquarium store. (Id.) The bank statement dated March 15, 2013, reflects total expenditures of $491.38 at ABC Fine Wine, total expenditures of $259.93 at the iTunes store, and total expenditures of $617.56 at the Shores Resort and Spa. (Id.) The bank statement dated April 15, 2013, reflects total expenditures of $637.47 at ABC

Fine Wine and total expenditures of $49.99 at the iTunes store. (Id.) The bank statement dated May 13, 2013, reflects total expenditures of $421.66 at ABC Fine Wine and total expenditures of $49.99 at the iTunes store. (Id.) The bank statement dated June 14, 2013, reflects total expenditures of $339.69 at ABC Fine Wine and total expenditures of $349.93 at the iTunes store. (Id.)

## Conclusions of Law

Section 707(b)(1) of the Bankruptcy Code provides that a court may dismiss a Chapter 7 case filed by an individual whose debts are primarily consumer debts if it finds that the granting of relief would be an abuse of the provisions of Chapter 7. The Trustee seeks to have the case dismissed pursuant to 11 U.S.C. §§ 707(b)(3)(A) and (B) which respectively provide:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider--

> (A) whether the debtor filed the petition in bad faith; or

> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707. The Court turns first to the totality of the circumstances.

I.    The Totality of Debtor's Financial Circumstances Does Not Warrant Dismissal

A debtor's ability to pay, as measured by what he could pay in a hypothetical 13 case, is the primary but not conclusive factor a court must consider in a § 707(b)(3)(B) analysis. In re Norwood-Hill, 403 B.R. 905, 912 (Bankr. M.D. Fla. 2009).[1] That is, the ability to pay, standing alone, is insufficient to warrant dismissal. Id. (citing In re Degross, 272 B.R. 309, 313 (Bankr.

---

[1] Because Debtor is not eligible to be a Chapter 13 debtor, the Court will determine Debtor's ability to pay in a hypothetical Chapter 11 case.

M.D. Fla. 2001)).  The better reasoned analysis is one which considers a debtor's ability to pay along with other circumstances.  Degross, 272 B.R. at 313.  If a debtor has the ability to pay something, the Court looks to the following factors, to the extent they are helpful, to determine whether they militate against or in favor of dismissal: 1) whether unforeseen or catastrophic events such as sudden illness, disability, or unemployment propelled the debtor into bankruptcy; 2) whether the debtor's standard of living has substantially improved as a result of the bankruptcy filing or essentially remained the same; 3) the debtor's age, health, dependents, and other family responsibilities; 4) the debtor's eligibility for Chapter 13 relief and whether creditors would receive a meaningful distribution in a Chapter 13 case; 5) the age of the debts for which the debtor seeks a discharge and the period over which they were incurred; 6) whether the debtor incurred cash advances and made consumer purchases far in excess of the ability to repay; 7) whether the debtor made any payments toward the debts or attempted to negotiate with creditors; and 8) the accuracy of the debtor's schedules and statement of current income and expenses. Norwood-Hill, 403 B.R. at 912.

A.  Imputation of Income to Debtor is not Appropriate

Because a totality of the circumstances analysis requires a court to determine a debtor's ability to pay, post-petition events are properly considered under § 707(b)(3)(B).  In re Henebury, 361 B.R. 595, 609 (Bankr. S.D. Fla. 2007).  A debtor's voluntary unemployment weighs in favor of a finding of abuse.  In re Richie, 353 B.R. 569, 579-580 (Bankr. E.D. Wis. 2006).  Under certain circumstances, such as voluntary underemployment, a court may impute income to the debtor.  In re Gonzalez, 378 B.R. 168, 173 (Bankr. N.D. Ohio 2007).

The Trustee points out that while Debtor's counsel in his opening statement referenced ethical considerations as Debtor's basis for leaving Neurology Partners, Debtor did not present

any testimonial or documentary evidence to support his position. Additionally, the Trustee asserts that even if Debtor left his employment for valid reasons, he forfeited the possibility of securing a position that would supply him with an immediate income stream because he dismissed locations outside of his local area as too far away and dismissed opportunities within his area as inferior. The Trustee therefore urges the Court to place little weight on Debtor's post-petition loss of income.

The factual stipulation provides that Debtor "contends he left Neurology Associates due to philosophical and ethical differences with his partners … and felt that he could no longer in good faith continue [practicing] at Neurology Associates." That Debtor felt like he could no longer in good faith continue practicing at Neurology Associates is a satisfactory explanation to the Court; Debtor's failure to provide detailed and specific reasons for his departure does not lead the Court to conclude his reason for leaving was not valid. The Court finds it inappropriate to impute to Debtor's his previous approximate annual income of $500,000.00. Additionally, the Court finds Debtor's reasons as to why he opted to open his own practice in the Ormond Beach area rather than attempting to obtain employment at a hospital (in another city), with another group practice (in another city), or with another sole practitioner (in his city) to be both credible and reasonable. While there may be situations under which the imputation of income to a debtor would be warranted, this is not that situation.

B. Debtor Could Pay Little to Nothing in a Chapter 11 Plan

Even if the Court found fault with Debtor's failure to obtain a position with an immediate income stream and imputed to him an immediate annual income of $200,000.00, the totality of the circumstances would not warrant dismissal. The Trustee argues that based upon a $200,000.00 annual income, Debtor may be able to make some repayment to his creditors in a

10

Chapter 11 plan. The Trustee argues that Debtor has not taken steps to maximize his ability to repay his creditors because he has not sought to have his alimony and child support obligations modified and intends to rent a home that he estimates will cost him $5,000-$7,000.00 monthly. The Trustee also points to the fact that Debtor's household spent a substantial amount of money on iTunes products, aquarium supplies, spa services, and alcoholic beverages from January of 2013 to June of 2013.

Debtor testified that he has not attempted to have his alimony and support obligations modified because he cannot afford to retain an attorney to do so. The Court finds Debtor's explanation credible. Debtor's failure to seek a modification of those obligations does not support a finding of abuse. However, even if those obligations are subsequently significantly reduced[2] and Debtor rents a house for $1,334.00 a month, the IRS standard rental expense for a family of four in Volusia County, Debtor will not be able to fund a Chapter 11 Plan.

The parties stipulated that if Debtor's Schedule I and J were amended to indicate an anticipated annual salary of $200,000.00, which was taxed at 33%, Debtor's net monthly income would be $11,166.00. The parties stipulated that Debtor's monthly health insurance premium will be $2,008.44 and Debtor's monthly out of pocket medical expenses are $1,363.00. Debtor has a monthly vehicle payment of $480.28. Even if the Court only reduced Debtor's disposable income by an additional $1,334.00, representing a rental payment for a home, Debtor would be left with $5,980.28 monthly with which to pay a myriad of other expenses including alimony and child support, food, clothing, gas, car insurance, life insurance and to fund a Chapter 11 Plan. Simply put, Debtor can pay little to nothing in a Chapter 11 Plan.

The Court is troubled by Debtor's household's monthly expenditures on alcohol and the

---

[2] A reduction in Debtor's alimony and child support is wholly speculative.

11

iTunes store. Such spending is made worse by the fact that Debtor failed to pay alimony and, more importantly, child support during that time, apparently prioritizing the former over the latter. That Debtor's household spent $2,903.22 on alcohol, $1,174.66 at the iTunes store, $1,364.64 at aquarium stores, and $617.56 at a spa for a total of $6,060.08 during a period in which Debtor made no child support payments is inexplicable. That having been said, it is impossible to say that in the absence of those expenses, Debtor would have been able to fund a Chapter 11 plan or even get a plan confirmed. The payment of post-petition domestic support obligations is a condition of confirmation pursuant to 11 U.S.C. § 1129. Setting aside the issue of past due alimony, Debtor would have to pay the child support arrearage of at least $14,600.00 in order to get a plan confirmed. Accordingly, the Court cannot conclude that Debtor would have been able to fund a Chapter 11 plan if his household had not incurred the approximate $6,000.00 in unnecessary expenses.

C. The Remaining Factors Do not Militate in Favor of Dismissal

Even if Debtor could fund a Chapter 11 plan, none of the remaining factors militates in favor of dismissal and at least two militate against dismissal. First, Debtor's son's cardiac conditions will continue to affect him for the rest of his life and will result in continuing medical expenses, not all of which are covered by insurance. While Debtor's son has not been admitted to a hospital or required surgery since 2011, he has required emergency care for possible infections. Second, Debtor made payments on the Weekend Home from the time he purchased it in 2005 until 2009 when his son was born with a life threatening heart condition. Debtor attempted to negotiate with Wells Fargo and obtain a mortgage modification. However, Wells Fargo initiated a foreclosure action which led to the deficiency judgments and ultimately the garnishment of his bank account. In light of the fact that: 1) Debtor can pay little to nothing in a

12

Chapter 11 plan; 2) none of the remaining factors militates in favor of dismissal; and 3) at least two militate against dismissal, the Court finds that the totality of the circumstances of Debtor's financial situation does not demonstrate abuse.

## II.    The Case was not filed in Bad Faith

The focus of a court's bad faith analysis should be a debtor's intent and purpose at the time of the filing of the petition. In re Boyce, 446 B.R. 447, 451 (Bankr. D. Or. 2011). Neither the Bankruptcy Code nor BAPCPA's legislative history defines bad faith. However, "[t]he common thread running through all of the indicia of bad faith is improper intent. A debtor, for bad faith to exist, must have purposefully acted and such action [must have been] motivated by an improper purpose." In re Ricci, 456 B.R. 89, 105 (Bankr. M.D. Fla. 2009). "The [totality of the circumstances] inquiry looks for 'atypical' conduct that falls short of the 'honest and forthright invocation of the [Bankruptcy] Code's protections[.]'" In re Piazza, 719 F.3d 1253, 1271 (11th Cir. 2013) (internal citations omitted)(analyzing concept of bad faith under § 707(a)). "Among other considerations which might indicate bad faith fact are a debtor's 'intent to abuse the judicial process,' a debtor's intentional efforts to 'delay or frustrate' legitimate creditors, a debtor 'deliberately rack[ing] up debts he has *no ability to repay and then seek[ing] to shield himself from creditors through bankruptcy*,' a debtor having '*non-economic motives*' including 'to frustrate [a] divorce court decree' or force an ex-spouse into bankruptcy, a debtor 'using bankruptcy as a refuge from another court's jurisdiction,' a debtor making 'every effort to avoid payment of an obligation' despite being 'capable of at least partial repayment,' (internal quotation marks omitted), a debtor having primarily a 'single creditor,' a debtor's 'failure to make significant lifestyle adjustments or efforts to repay,' and a disproportionate debt-to-income ratio in the absence of a 'marked calamity or sudden loss of income[.]'" Id. at 1272 n.7 (internal

citations omitted). Other considerations include purchases on the eve of filing, incomplete or false disclosures by the debtor, and failure by the debtor to cooperate with the trustee. In re Ricci, 456 B.R. at 105.

The Trustee argues that Debtor filed the case in bad faith because, although he was not contemplating leaving Neurology Associates at the time he filed the petition, he represented that he could not pay any significant amount toward the deficiency judgment on the Weekend Home while intending to keep an extravagant home as a primary residence.

The Court does not find that Debtor filed the case in bad faith. There is no evidence before the Court that Debtor was motivated by an improper purpose or intended to abuse the judicial process. There is no evidence that Debtor intentionally delayed or frustrated his creditors. There is no evidence that Debtor deliberately incurred debts he had no ability to pay and then sought to shield himself through bankruptcy. Debtor's only unsecured debt is the deficiency judgment on the Weekend Home. Debtor purchased the Weekend Home in 2005 and made payments on the mortgage on the Weekend Home until his son's medical issues arose in 2009. Debtor attempted to modify the mortgage payments, but Wells Fargo, the mortgagee, initiated a foreclosure action and obtained deficiency judgments against him. There is no evidence that Debtor had any non-economic motive for filing this bankruptcy case. Finally, there is no evidence that Debtor made purchases on the eve of filing, made any incomplete or false disclosure, or failed to cooperate with the Trustee.

While Debtor may have been capable of some repayment on the unsecured deficiency on the Weekend Home at the time he filed the case, there is no evidence that he made any efforts, such as transferring or otherwise shielding assets, to avoid paying the obligation. If Debtor had initially opted to surrender the Pheasant Run Property and move into a more modest rental home,

14

his unsecured debt would have gone from approximately $950,000.00 to approximately $1,760,124.00. While Debtor's monthly disposable income would have increased by approximately $9,500.00, that amount would have been reduced by a rental payment on a home, additional attorney's fees associated with a Chapter 11 case, and United States Trustee fees. The remainder, assuming that Debtor's income did not decrease[3] and that Debtor's son's heart condition did not result in any out of pocket medical expenses beyond Debtor's normal out of pocket expenses of $1,363.00 per month, would have been available to pay unsecured creditors in a Chapter 11 case. It is impossible to determine with any degree of certainty what amount Debtor might have been able to pay into a Chapter 11 Plan if he had maintained his employment at Neurology Associates and surrendered the Pheasant Run Property in favor of more affordable housing. However, even considering the uppermost range of what Debtor might have been able to pay into a Chapter 11 plan, the Court does not find that his initial decision to retain rather than surrender the Pheasant Run Property constitutes bad faith.

Conclusion

Because the totality of the circumstances of Debtor's financial situation does not demonstrate abuse and Debtor did not file this case in bad faith, dismissal of the case is not warranted and the Court will deny the Trustee's Motion to Dismiss. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

**DATED** this 18 day of March, 2014 in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge

---

[3] As the Court noted, Debtor testified that beginning in January, 2013, as a result of the Affordable Care Act, any procedure that he performed which was billed to Medicare or Medicaid would be subject to a 25% reduction.